**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiffs***

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONDALISA LEGRAND and LARISSA BATES, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | Case No.: 3:22-cv-5815<br><br>CLASS ACTION<br><br>**COMPLAINT FOR CONSUMER FRAUD, BREACH OF EXPRESS & IMPLIED WARRANTIES, NEGLIGENT AND INTENTIONAL MISREPRESENTATION, AND UNJUST ENRICHMENT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Condalisa LeGrand and Larissa Bates, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, bring this action against Abbott Laboratories ("Abbott"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1.      Abbott sells a line of "nutrition" drinks under the "Ensure" brand (the "Ensure Nutrition Drinks" or "Products"), which it markets with health and wellness labeling representations such as "#1 Doctor Recommended Brand," "Complete, Balanced Nutrition for everyday health," and drink "2 bottles per day as part of a healthy diet."[1] In addition to these general health and wellness representations, Abbott markets certain Ensure Nutrition Drinks as providing specific benefits, like supporting immune, heart, and digestive health. These and the other representations challenged in this complaint are all designed and intended to convince consumers Ensure Nutrition Drinks are healthy food choices.

2.      But Abbott's representations and omissions are false and misleading because, although there is a vast body of scientific evidence demonstrating that consuming sugar sweetened beverages harms rather than supports overall health—and immune, heart, and digestive health in particular—Abbott adds up to 22 grams of sugar per serving to the Ensure Nutrition Drinks. In light of this sugar content and the scientific evidence, Abbott's representations that the Ensure Nutrition Drinks are balanced, nutritious, and healthy, are false and misleading.

3.      Plaintiffs brings this action against Abbott on behalf of themselves, similarly-situated Class Members, and the general public to enjoin Abbott from deceptively marketing the Ensure Nutrition Drinks, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

4.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from

---

[1] These Products include various sizes and flavors of (i) Ensure Original Nutrition Shake, (ii) Ensure Complete Nutrition Shake, (iii) Ensure Enlive Advanced Nutrition Shake, (iv) Ensure Compact Therapeutic Nutrition Shake, (v) Ensure Clear Nutrition Drink, and (vi) Ensure Original Nutrition Powder.

Abbott. In addition, more than two-thirds of the members of the class reside in states other than the state in which Abbott is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

5.    The Court has personal jurisdiction over Abbott because it has purposely availed itself of the benefits and privileges of conducting business activities within California, including by marketing, distributing, and selling the Ensure Nutrition Drinks in California.

6.    Venue is proper in this Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Abbott resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## DIVISIONAL ASSIGNMENT

7.    This civil action arises out of the acts and omissions of Abbott, which occurred in Contra Costa County. Pursuant to Civil Local Rule 3-2(c), (d), this action is correctly assigned to the San Francisco or Oakland Division.

## PARTIES

8.    Plaintiff Condalisa LeGrand is a resident of California.

9.    Plaintiff Larissa Bates is a resident of New York.

10.    Defendant Abbott is an Illinois corporation with its principal place of business in Abbott Park, Illinois.

## FACTS

## I.    ABBOTT LABELS THE ENSURE NUTRITION DRINKS WITH HEALTH AND WESSNESS CLAIMS

11.    For more than four years preceding the filing of this Complaint and continuing today, Abbott has sold and continues to sell the Ensure Nutrition Drinks on a nationwide basis, including in California and New York.

12.    As Abbott is well aware, consumers seek out and prefer healthful foods and beverages, and are willing to pay more for, or purchase more often, products marketed and labeled as healthy. For instance,

a Nielsen 2015 Global Health & Wellness Survey found that "88% of those polled are willing to pay more for healthier foods."[2]

13.     Abbott is a sophisticated marketing company that leverages this knowledge in its marketing strategy for the Ensure Nutrition Drinks, prominently touting them as—*inter alia*, the "#1 Doctor Recommended Brand," and a source of "complete, balanced nutrition," to "support your health."

**(i) Ensure Original Nutrition Shake**



14.     Throughout the relevant time period, Ensure Original Nutrition Shakes have been sold in a variety of flavors (with some flavors occasionally added or discontinued), including at least Milk Chocolate (pictured above), Vanilla, Strawberry, Dark Chocolate, Butter Pecan, Coffee Latte, and Banana Nut. All flavors contain 220 calories and 9 grams of added sugar, meaning that 16.5% of their calories come from added sugar.

15.     Despite their high added sugar content, Abbott touts each flavor as a **"nutrition shake"** that provides **"Complete, Balanced Nutrition"** and **"Complete, Balanced Nutrition for everyday health."** These claims, individually and especially in combination, convey that the Products as a whole are healthy and will benefit rather than detriment health. In addition, each label prominently represents it is the **"#1**

---

[2] Nancy Gagliardi, "Consumers Want Healthy Foods—And Will Pay More For Them," *Forbes* (Feb. 18, 2015) (citing Neilson, Global Health & Wellness Survey, at 11 (Jan. 2015)).

**Doctor Recommended Brand."** This materially reinforces and lends credibility to the message that the Ensure Products are healthy, effective at providing the claimed benefits, and backed by scientific evidence (since a reasonable consumer would not expect doctors to recommend products not backed by scientific evidence of their benefits, or products likely to harm health). These statements, both individually and in combination, convey that the Ensure Original Nutrition Shakes are beneficial to health and are formulated with a nutrient profile that is in line with authoritative medical or health recommendations.

16.     By focusing on the products' purported health benefits, while omitting information regarding the health harms of the products' added sugar content, Abbott conveys to consumers that the Ensure Original Nutrition Shakes provide the promised health benefits notwithstanding their added sugar content.

**(ii) Ensure Complete Nutrition Shake**



17.     Throughout the relevant time period, Ensure Complete Nutrition Shakes have been sold in a variety of flavors, including at least Vanilla (pictured above), Milk Chocolate, Strawberry, Dark Chocolate, and Butter Pecan. All flavors contain 350 calories and between 18 and 21 grams of added sugar depending on flavor, meaning that between 20.6% and 24% of their calories come from added sugar.

18.     Despite their high added sugar content, Abbott touts each flavor as a **"Complete" "nutrition shake"** that provides a **"Complete, Balanced Meal Replacement"** for, *inter alia*, **"Immune," "Digesti[ve]"** and **"Heart,"** health; and **"Complete, Balanced Nutrition—For—. . . Heart . . . Immune"** health. Each product's label also states that **"Complete is Ensure's most advanced Complete, Balanced**

**Nutrition shake,"** and **"#1 Doctor Recommended Brand."** Multi-packs are sold in an outer cardboard box that further invites consumers to **"Discover More at Ensure.Com"** in order to **"Learn About Ensure Complete's Nutrition and Benefits"** and **"Chat Live with a Registered Dietitian About Nutrition."** These statements, both individually and in combination, convey that the Ensure Complete Nutrition Shakes are beneficial to health generally.

19.     The multi-packs also bear a prominent "shield" graphic stating, **"with Nutrients for Immune System Support."** That statement and shield—a symbol commonly used by health care providers like paramedics and health insurance companies like Blue Cross Blue Shield—together convey that Ensure Complete Nutrition Shakes benefit rather than detriment immune health and are generally healthy.

20.     By focusing on the products' purported health benefits, while omitting information regarding the health harms of the products' added sugar content, Abbott conveys to consumers that the Ensure Complete Nutrition Shakes provide the promised health benefits notwithstanding their added sugar content.

### (iii) Ensure Enlive Advanced Nutrition Shake

 

21.     Throughout the relevant time period, Ensure Enlive Advanced Nutrition Shakes have been sold in a variety of flavors, including at least Vanilla (pictured above), Milk Chocolate, and Strawberry. All

flavors contain 350 calories and either 20 or 22 grams of added sugar depending on flavor, meaning that between 22.9% and 28.6% of their calories come from added sugar.

22.     Despite their high added sugar content, Abbott touts each flavor as an **"advanced nutrition shake"** that provides **"All In One . . . Heart[,] Immune[, and] Digestion"** support. The side of each bottle further claims it is Abbott's **"most advanced nutritional product"** with an **"All-in-One blend to support your health."** Abbott **"Recommend[s] 2 bottles per day as part of a healthy diet."** Following this recommendation would contribute 40 to 44 grams of added sugar to a person's diet from just the Ensure Enlive Nutrition Shakes alone. In addition, each label prominently claims that it is the **"#1 Doctor Recommended Brand."**

23.     An earlier version of the Ensure Enlive Advanced Nutrition Shake label similarly stated on the side panel that it is Abbott's **"most advanced nutritional product, designed to help rebuild your strength and energy from the inside, with an All-in-One blend to support your health."** The label also included the identical **"Recommend[ation] [of] 2 bottles per day as part of a healthy diet."**

24.     Accordingly, notwithstanding any slight variations in packaging, Abbott at all relevant times conveyed the same material messages regarding the healthfulness of the Ensure Enlive Advance Nutrition Shakes. In addition to expressly promising **"complete, balanced nutrition,"** as well as heart, immune, and digestive health, these statements convey, both individually and in combination, that the Ensure Enlive Advanced Nutrition Shakes are beneficial to overall health.

25.     By focusing on the products' purported health benefits, while omitting information regarding the health harms of the products' added sugar content, Abbott conveys to consumers that the Ensure Enlive Advanced Nutrition Shakes provide the promised health benefits notwithstanding their added sugar content.

[continued on following page]

**(iv) Ensure Compact Therapeutic Nutrition Shake**



26.     Throughout the relevant period, Ensure Compact Therapeutic Nutrition Shakes have been sold in a variety of flavors, including at least Milk Chocolate (pictured above) and Vanilla. Both flavors contain 220 calories and either 9 or 10 grams of added sugar, meaning that between 16.4% and 18.2% of their calories come from added sugar.

27.     Despite their high added sugar content, Abbott touts each flavor as a **"therapeutic nutrition shake."** Because "therapeutic" is defined as "relating to the healing of disease,"[3] this statement conveys that the Ensure Compact Therapeutic Nutrition Shakes are healthy, rather than detrimental to health. In addition, each label prominently claims the product is the **"#1 Doctor Recommended Brand."** In addition to expressly promising **"complete, balanced nutrition,"** these statements, both individually and in combination, convey that the Ensure Compact Therapeutic Nutrition Shakes are healthy and effective at providing the claimed benefits.

28.     By focusing on their purported health benefits while omitting information regarding the health harms of their added sugar content, Abbott conveys to consumers that the Ensure Compact Therapeutic Nutrition Shakes provide the promised health benefits notwithstanding their added sugar content.

---

[3] https://www.encyclopedia.com/therapeutic (Oxford Pocket Dictionary).

**(v) Ensure Clear Nutrition Drink**




29.     Throughout the relevant time period, Ensure Clear Nutrition Drinks have been sold in a variety of flavors, including at least Blueberry Pomegranate (pictured above) and Mixed Fruit. Both flavors contain 250 calories and 13 grams of added sugar, meaning that 40% of their calories come from added sugar.

30.     Despite their high added sugar content, Abbott touts each flavor as a **"nutrition drink"** and prominently claims that it is the **"#1 Doctor Recommended Brand."** These statements, both individually and in combination, convey that the Ensure Clear Nutrition Drinks are healthy and are effective at providing the claimed benefits.

31.     By focusing on their purported health benefits while omitting information regarding the health harms of their added sugar content, Abbott conveys to consumers that the Ensure Clear Nutrition Drinks provide the promised health benefits notwithstanding their added sugar content.

///

///

///

///

1

**(vi) Ensure Original Nutrition Powder**

2

3




4

5

6

7

8

9

10

11

12

13

14        32.      Throughout the relevant period, Ensure Original Nutrition Powder has been sold in at least a

15    Vanilla flavor (pictured above). The Ensure Original Nutrition Powder contains 180 calories and 18 grams

16    of added sugar, meaning that 20.8% of its calories come from added sugar.

17        33.      Despite its high added sugar content, Abbott touts the product as a **"nutrition powder"**

18    offering **"Complete, Balanced Nutrition — for everyday health."** In addition, each label prominently

19    claims it is the **"#1 Doctor Recommended Brand."** The side panel of each Ensure Original Nutrition

20    Powder further states that **"Each serving of #1 Dr. Recommended Ensure is a source of complete,**

21    **balanced, nutrition$^{TM}$ including 26 essential vitamins and minerals. Use this convenient mix nutrition**

22    **powder for supplemental use between or with meals."** These claims, individually and especially in

23    combination, convey that the product as a whole is healthy and will benefit rather than detriment health.

24        34.      By focusing on its purported health benefits while omitting information regarding the health

25    harms of its added sugar content, Abbott conveys to consumers that Ensure Original Nutrition Powder

26    provides the promised health benefits notwithstanding its added sugar content.

27

28

9

## II. SCIENTIFIC EVIDENCE DEMONSTRATES SUGAR-SWEETENED BEVERAGE CONSUMPTION IS HARMFUL TO HEALTH

35.     Although, as with Abbott's Ensure Products, "[sugar sweetened] beverages are often fortified with added nutrients that are advertised as providing health benefits, including vitamins, minerals and other herbals," in reality, "the sugar content and potential adverse effects of some additives outweigh any potential benefit these ingredients may provide, especially among youth."[4] Accordingly, "[l]imiting SSBs has been widely promulgated by public health policy and scientific documents as a prudent strategy for promoting optimal nutrition and health."[5] Even a cursory review of the scientific record demonstrates why this is so.

### A. Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Cardiovascular Heart Disease and Mortality

36.     The scientific literature demonstrates that consumption of sugar-sweetened beverages has deleterious effects on heart health.

37.     In a study of preschool children published in January 2020, researchers found that higher consumption of sugar-containing beverages was significantly associated with elevated CMR (cardiometabolic risk) scores. The researchers stated that their "findings support recommendations to limit overall intake of SCB in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[6]

38.     Data obtained from NHANES surveys demonstrate that adults who consumed 10% - 24.9% of their calories from added sugar had a 30% greater risk of cardiovascular disease (CVD) mortality than those who consumed 5% or less of their calories from added sugar. In addition, those who consumed 25% or more of their calories from added sugar had an average 275% greater risk of CVD mortality than those who consumed less than 5% of calories from added sugar. Thus, "[t]he risk of CVD mortality increased

---

[4] Pirotin S., Becker C., Crawford PB, "Looking beyond the marketing claims of new beverages: Health risks of consuming sport drinks, energy drinks, fortified waters and other flavored beverages," Atkins Center for Weight and Health, UC Berkeley (2014) [hereinafter "Pirotin, Looking beyond the marketing claims of new beverages"].

[5] Zheng, M., et al., "Substitution of SSB with other beverage alternatives," Academy of Nutrition and Dietetics (2015).

[6] Eny, KM, et al., "Sugar-containing beverage consumption and cardiometabolic risk in preschool children." *Prev. Med. Reports* 17 (Jan. 14, 2020).

exponentially with increasing usual percentage of calories from added sugar[.]"[7] The NHANES analysis also found "a significant association between sugar-sweetened beverage consumption and risk of CVD mortality," with an average 29% greater risk of CVD mortality "when comparing participants who consumed 7 or more servings/wk . . . with those who consumed 1 serving/wk or less . . . ."[8]

39.     In another prospective cohort study, consumption of sugary beverages was significantly shown to increase risk of CHD, as well as adverse changes in some blood lipids, inflammatory factors, and leptin.[9]

40.     Sugar-sweetened beverage consumption is also associated with several CHD risk factors. For example, consumption of sugary beverages has been associated with dyslipidemia,[10] obesity,[11] and increased blood pressure.[12]

**B.    Scientific Evidence Demonstrates Sugar-Sweetened Beverage Consumption Impairs the Immune System**

41.     The scientific literature demonstrates that consumption of sugar-sweetened beverages has deleterious effects on immune system function.

---

[7] Yang, Quanhe, et al., "Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults," *JAMA*, at E4-5 (pub. online, Feb. 3, 2014).

[8] *Id.* at E6.

[9] Koning, L.D., et al., "Sweetened Beverage Consumption, Incident Coronary Heart Disease, and Biomarkers of Risk in Men," *Circulation*, Vol. 125, pp. 1735-41 (2012).

[10] Elliott S.S., et al., "Fructose, weight gain, and the insulin resistance syndrome," *Am. J. Clin. Nutr.*, Vol. 76, No. 5, pp. 911-22 (2002).

[11] Faith, M.S., et al., "Fruit Juice Intake Predicts Increased Adiposity Gain in Children From Low-Income Families: Weight Status-by-Environment Interaction," *Pediatrics*, Vol. 118 (2006) ("Among children who were initially either at risk for overweight or overweight, increased fruit juice intake was associated with excess adiposity gain, whereas parental offerings of whole fruits were associated with reduced adiposity gain."); Schulze, M.B, et al., "Sugar-Sweetened Beverages, Weight Gain, and Incidence of Type 2 Diabetes in Young and Middle-Aged Women," *JAMA*, Vol. 292, No. 8, pp. 927-34 (2004) [hereinafter "Schulze, Diabetes in Young & Middle-Aged Women"]; Ludwig, D.S., et al., "Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis," *Lancet*, Vol. 257, pp. 505-508 (2001); Dennison, B.A., et al., "Excess fruit juice consumption by preschool-aged children is associated with short stature and obesity," *Pediatrics*, Vol. 99, pp. 15-22 (1997).

[12] Hoare, E., et al., "Sugar- and Intense-Sweetened Drinks in Australia: A Systematic Review on Cardiometabolic Risk," *Nutrients*, Vol. 9, No. 10 (2017).

42.     First, neutrophils are the most common type of white blood cell (leukocytes) and they act as the immune system's first line of defense. Neutrophils ordinarily protect the body by traveling to the source of an infection or pathogen where they digest and destroy invading microorganism. But consuming sugar-sweetened beverages like the challenged Ensure Products causes blood sugar to rise quickly. This in turn activates an enzyme called protein kinase C, which leads to dysfunction in neutrophils significantly reducing the ability of this important part of the immune system to protect the body and fight off infection.[13]

43.     Second, high blood sugar is associated with the inability of immune cells to properly "tag" foreign pathogens so they can be destroyed.[14]

44.     Third, high blood sugar contributes to multiple defective immune responses, including a decrease in IL-6, a chemical messenger necessary for a proper immune response.[15]

45.     Accordingly, Abbott's marketing Ensure Complete Nutrition Shakes and Ensure Advanced Nutrition Shakes as improving or supporting "immune health" is false, or at least highly misleading.

**C.     Scientific Evidence Demonstrates Sugar-Sweetened Beverage Consumption Harms Digestive Health**

46.     Scientific evidence demonstrates that sugar-sweetened beverage consumption harms gut microbiota and the gut barrier.

**1.     The Added Sugar in Ensure Harms the Gut Microbiota**

47.     Diet plays a central role in shaping the microbiota that make up the gut biome in human digestive tracts. In fact, studies "suggest that diet has a dominant role over other possible variables such as ethnicity, sanitation, hygiene, geography, and climate, in shaping the gut microbiota."[16]

---

[13] Jafar N, et al., "The Effect of Short-Term Hyperglycemia on the Innate Immune System," *Am. J. Med. Sci*. Vol. 351(2), 201-11 (Feb. 2016).

[14] Margaret K. Hostetter, "Handicaps to Host Defense: Effects of Hyperglycemia on C3 and Candida albicans," *Diabetes* 1; 39 (3): 271–275 (Mar. 1990).

[15] Spindler MP et al., "Acute hyperglycemia impairs IL-6 expression in humans," *Immun. Inflamm. Dis*. 19;4(1):91-7 (Jan. 2016).

[16] De Filippo, C., et al., "Impact of diet in shaping gut microbiota revealed by a comparative study in children from Europe and rural Africa," *PNAS*, Vol. 107, No. 33, 14691-14696 (August 17, 2010) [hereafter "De Filippo, Diet-Induced Dysbiosis of the Intestinal Microbiota"]; *see also* Brown, K, et al., "Diet-Induced Dysbiosis of the Intestinal Microbiota and the Effects on Immunity and Disease," *Nutrients* 4, 1095-1119

48.     Studies also show that certain types of nutrients have specific effects on the gut microbiota. Relevant here, "diets rich in simple sugars favor the expansion of [harmful microbial] organisms"[17] in at least four separate ways. First, simple sugars serve as a nutrient for harmful bacteria and "[r]ecent studies have shown that high intake of sugars increase the relative abundance of [harmful] Proteobacteria in the gut, while simultaneously decreasing the abundance of [beneficial] Bacteroidetes."[18] Second, high sugar diets result in "lost gut microbial diversity."[19] Third, because consuming sugar increases bile output, "[r]efined sugars," also "mediate the overgrowth of opportunistic[, harmful] bacteria like C. difficile and C. perfringens,"[20] which feed on the bile. Fourth, sugar "can impact gut colonization by the microbiota independently of their ability to serve as nutrients" since both "fructose and glucose silence a critical colonization factor, called Roc, in a widely distributed gut commensal bacterium B. thetaiotaomicron."[21]

49.     These changes in the gut microbiota composition harm digestive health and increase risk of chronic digestive tract conditions. Specifically, "[e]vidence suggests that the composition of the intestinal

---

(2012) ("the composition of the gut microbiota strongly correlates with diet as demonstrated by a study assessing the relative contributions of host genetics and diet in shaping the gut microbiota" "dietary changes could explain 57% of the total structural variation in gut microbiota whereas changes in genetics accounted for no more than 12% This indicates that diet has a dominating role in shaping gut microbiota").

[17] Townsend II, G., et al., "Dietary sugar silences a colonization factor in a mammalian gut symbiont," *PNAS*, Vol. 116, No. 1, 233-238 (January 2, 2019) [hereinafter "Townsend II, Dietary sugar silences a colonization factor"].

[18] Satokari, R., "High Intake of Sugar and the Balance between Pro- and Anti-Inflammatory Gut Bacteria," *Nutrients* 12(5), 1348 (published online May 8, 2020) [hereinafter "Satokari, High Intake of Sugar"].

[19] Ho Do, M., et al., "High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders in Mice without Body Weight Change," *Nutrients* 2018, 10, 761 (June 13, 2018) [hereinafter "Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders "]; *see also* Jian-Mei Li, et al., "Dietary fructose-induced gut dysbiosis promotes mouse hippocampal neuroinflammation: a benefit of short-chain fatty acids," *Microbiome*, 7, Article No. 98 (June 29, 2019) ("The abundance of Bacteroidetes was significantly decreased and Proteobacteria was significantly increased in fructose-fed mice") [hereinafter "Jian-Mei Li, Dietary fructose-induced gut dysbiosis"].

[20] De Filippo, Diet-Induced Dysbiosis of the Intestinal Microbiota, *supra* n.16.

[21] Townsend II, Dietary sugar silences a colonization factor, *supra* n.17 ("dietary simple sugars can suppress gut colonization in a commensal bacterium just by altering the levels of a colonization factor [know as Roc] dispensable for the utilization of such sugars.").

microbiota can influence susceptibility to chronic disease of the intestinal tract including ulcerative colitis, Crohn's disease, celiac disease and irritable bowel syndrome . . . ."[22]

50.     In sum, "high sugar intake may stagger the balance of microbiota to have increased pro-inflammatory properties and decreased [] capacity to regulate epithelial integrity and mucosal immunity. Consequently, high dietary sugar can, through the modulation of microbiota, promote metabolic endotoxemia, systemic (low grade) inflammation and the development of metabolic dysregulation and thereby, high dietary sugar may have many-fold deleterious health effects, in addition to providing excess energy." [23]

### 2.     The Added Sugar in Ensure Harms the Gut Barrier

51.     "The gut barrier consists of a specialized, semi-permeable mucosal, and epithelial cell layers that are reinforced by tight junction proteins. Among other functions, this barrier serves to regulate nutrient and water entry and prevents the entry of harmful compounds into extra-luminal tissues" and the blood.[24]

52.     When the permeability of the gut or epithelial barrier is increased, this "allows for the influx of adverse substances and may ultimately contribute to the development of metabolic disorders, and cognitive dysfunction."[25]

53.     "A compromised gut barrier makes the intestinal tract potentially vulnerable to the gram-negative bacteria-derived LPS, which upon excess entry into circulation promotes endotoxemia and systemic inflammation."[26]

54.     Both fructose and glucose increase gut barrier permeability.

55.     First, "[a]lthough dietary fructose was thought to be metabolized exclusively in the liver, evidence has emerged that it is also metabolized in the small intestine and leads to intestinal epithelial barrier

---

[22] De Filippo, Diet-Induced Dysbiosis of the Intestinal Microbiota, *supra* n.16.

[23] Satokari, High Intake of Sugar, *supra* n.18.

[24] Noble, E., et al., "Gut to Brain Dysbiosis: Mechanisms Linking Western Diet Consumption, the Microbiome, and Cognitive Impairment," *Front Behav. Neurosci.* 11:9 (published online January 30, 2017).

[25] *Id.*

[26] *Id.* (Studies have found "elevated plasma levels of a gavaged fluorescent molecule (FITC-dextran) that is typically unable to cross the gut barrier.").

deterioration."[27] A high fructose diet, for example, has been found to result in the "thinning of the intestinal mucosa, epithelium, and muscularis mucosae," and the "loss of crypts and glands," among other harmful effects.[28] This "increase[d] intestinal permeability" "precedes the development of metabolic endotoxemia, inflammation, and lipid accumulation, ultimately leading to hepatic steatosis and normal-weight obesity."[29] In addition, "fructose can escape absorption in the small intestine and reach the microbiota in the distal gut, where microbiota-derived products of fructose metabolism enter the host blood."[30] Thus, "excessive fructose consumption" has been shown to "result[] in barrier deterioration, dysbiosis, low-grade intestinal inflammation, and endotoxemia."[31] In short, consuming fructose, like that in the Ensure Nutrition Drinks, has numerous harmful effects on the gut barrier.[32]

56.     Glucose also harms the gut barrier. For example, both a "[high glucose diet] and [high fructose diet] increased gut permeability and disrupted the gut barrier."[33] This harms digestive tract health because

---

[27] Febbraio, M., et al., "'Sweet death': Fructose as a metabolic toxin that targets the gut-liver axis*," Cell Metab.*7;33(12):2316-2328 (published online October 6, 2021) [hereinafter "Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis"].

[28] Jian-Mei Li, Dietary fructose-induced gut dysbiosis, *supra* n.19.

[29] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.19.

[30] Townsend II, Dietary sugar silences a colonization factor, *supra* n.17.

[31] Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis, *supra* n.27.

[32] *See* Satokari, High Intake of Sugar, *supra* n.18 ("consuming high amounts of sugar harms the gut by "increasing small intestinal permeability in healthy humans,"); Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.19 ("diet induced changes in the gut microbiota affect the expression of tight junction proteins and inflammatory cytokines, which leads to increased gut permeability and inflammation"); Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis, *supra* n.35 ("fructose, . . . led to the downregulation of enterocyte tight-junction proteins and subsequent barrier deterioration, which is in agreement with previous rodents and human studies (Jin et al., 2014; Kavanagh et al., 2013; Lambertz et al., 2017; Spruss et al., 2012)."); Young-Eun Cho, et al., "Fructose Promotes Leaky Gut, Endotoxemia, and Liver Fibrosis Through Ethanol-Inducible Cytochrome P450-2E1–Mediated Oxidative and Nitrative Stress," *Hepatology*, Vol. 73, Issue 6, June 2021, 2180-2195 (April 8, 2019) ("fructose intake causes protein nitration of intestinal [tight-junction] and AJ proteins, resulting in increased gut leakiness, endotoxemia, and steatohepatitis with liver fibrosis").

[33] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.19.

"damaged gut barriers" lead to endotoxins crossing the epithelial and into the blood stream, resulting in "higher [blood] plasma endotoxin levels."[34]

57.    Moreover, high levels of glucose in the blood, known as "[h]yperglycemia[,] markedly interfere[s] with homeostatic epithelial integrity, leading to abnormal influx of immune-stimulatory microbial products and a propensity for systemic spread of enteric pathogens."[35] This happens, at least in part, because "hyperglycemia causes retrograde transport of glucose into intestinal epithelial cells via GLUT2, followed by alterations in intracellular glucose metabolism and transcriptional reprogramming."[36] In short, "experiments establish hyperglycemia as a direct and specific cause for intestinal barrier dysfunction and susceptibility to enteric infection,"[37] such that "[b]lood glucose concentrations are associated with microbial product influx in humans[.]" [38]

58.    Moreover, because consuming "[s]ugar has [ ] been shown to irritate the lining of the stomach and intestine," it actually "compromises digestive function and the absorption of nutrients" and can "induce diarrhoea [sic], which may lead to further loss of nutrients."[39]

### D.    Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Obesity

59.    Excess added sugar consumption leads to weight gain and obesity because insulin secreted in response to sugar intake instructs the cells to store excess energy as fat. This excess weight can then exacerbate the problems of excess added sugar consumption, because excess fat, particularly around the waist, is in itself a primary cause of insulin resistance, another vicious cycle. Studies have shown that belly fat produces hormones and other substances that can cause insulin resistance, high blood pressure, abnormal

---

[34] *Id.*

[35] Thaiss, C., et al., "Hyperglycemia drives intestinal barrier dysfunction and risk for enteric infection," *Science* 359, 1376–1383 (March 23, 2018) ("We have identified glucose as an orchestrator of intestinal barrier function.").

[36] *Id.*

[37] *Id.*

[38] *Id.* (Human studies "suggest that similar to their effects in mice, serum glucose concentrations, rather than obesity, may associate with or potentially even drive intestinal barrier dysfunction in humans.").

[39] DiNicolantonio JJ, Berger A., "Added sugars drive nutrient and energy deficit in obesity: a new paradigm," *Open Heart* (2016) [hereinafter "DiNicolantonio, Added sugars drive nutrient and energy deficit"].

cholesterol levels, and cardiovascular disease. And belly fat plays a part in the development of chronic inflammation in the body, which can cause damage over time, and without any signs or symptoms.

60.    A meta-analysis by Harvard researchers evaluating change in Body Mass Index per increase in 1 serving of sugar-sweetened beverages per day found a significant positive association between beverage intake and weight gain.[40]

61.    One study of more than 2,000 2.5-year-old children followed for three years found that those who regularly consumed sugar-sweetened beverages between meals had a 240% better chance of being overweight than non-consumers.[41]

62.    An analysis of data for more than 50,000 women from the Nurses' Health Study during two 4-year periods showed that weight gain over a 4-year period was highest among women who increased their sugar-sweetened beverage consumption from 1 or fewer drinks per week, to 1 or more drinks per day (8.0 kg gain during the 2 periods), and smallest among women who decreased their consumption or maintained a low intake level (2.8 kg gain).[42]

63.    A study of more than 40,000 African American women over 10 years had similar results. After adjusting for confounding factors, those who increased sugar-sweetened beverage intake from less than 1 serving per week, to more than 1 serving per day, gained the most weight (6.8 kg), while women who decreased their intake gained the least (4.1 kg).[43]

64.    Experimental short-term feeding studies comparing sugar-sweetened beverages to artificially-sweetened beverages have shown that consumption of the former leads to greater weight gain. In one 10-week trial involving more than 40 men and women, the group that consumed daily supplements of sucrose (for 28% of total energy) increased body weight and fat mass—by 1.6 kg for men and 1.3 kg for women—

---

[40] Malik, V.S., et al., "Sugar-sweetened beverages and BMI in children and adolescents: reanalyses of a meta-analysis," *Am. J. Clin. Nutr.*, Vol. 29, 438-39 (2009).

[41] Dubois, L., et al., "Regular sugar-sweetened beverage consumption between meals increases risk of overweight among preschool-aged children," *J. Am. Dietetic Association*, Vol. 107, Issue 6, 924-34 (2007).

[42] Schulze, Diabetes in Young & Middle-Aged Women, *supra* n.11.

[43] Palmer, J.R., et al., "Sugar-Sweetened Beverages and Incidence of Type 2 Diabetes Mellitus in African American Women," *Archive Internal Med.*, Vol. 168, No. 14, 1487-82 (July 28, 2008).

while the group that was supplemented with artificial sweeteners lost weight—1.0 kg for men and 0.3 kg for women.[44]

65. Because the scientific evidence demonstrates that sugar-sweetened beverage consumption is associated with inability to maintain a healthy weight, Abbott's representation that the Ensure Complete Nutrition Shake will help maintain a healthy weight is false, or at least highly misleading.

E. **Authoritative Bodies Recommend Excluding or Substantially Minimizing Added Sugar Consumption, Especially in the Form of Sugar-Sweetened Beverages**

1. **Because of the Scientific Evidence of Added Sugar's Health Harms, the FDA Has Proposed Defining "Healthy" Foods as Foods Whose Added Sugar Contributes No More Than 5% of Their Calories**

66. The FDA recently published a proposed rule "to update the definition for the implied nutrient content claim 'healthy' to be consistent with current nutrition science and Federal dietary guidance, especially the Dietary Guidelines for Americans (Dietary Guidelines), regarding how consumers can maintain healthy dietary practices."[45] In doing so, the FDA explained, "[e]vidence shows" that "a diet low in added sugars helps individuals achieve a healthy dietary pattern" such that "it is critical that foods" labeled as "'healthy' do not contribute to a dietary pattern that contains added sugars over the recommended levels."[46]

67. In order to achieve this, the FDA has proposed "a limit on the amount of added sugars in foods bearing the nutrient content claim 'healthy' to help consumers choose foods that will contribute to a healthy dietary pattern that is lower in added sugars, consistent with current nutrition science and Federal dietary guidance."[47] That limit, "[f]or individual foods," was found to be "≤5 percent of the DV [for added sugar] per [Reference Amount Customarily Consumed]," which is "≤2 ½ g for adults and children 4 years

---

[44] Raben, A., et al., "Sucrose compared with artificial sweeteners: different effects on ad libitum food intake and body weight after 10 wk of supplementation in overweight subjects," *Am. J. Clini. Nutr.*, Vol. 76, 721-29 (2002).

[45] 87 Fed. Reg. 59168, 59168 (Sept. 29, 2022).

[46] *Id.* at 59180.

[47] *Id.*

of age and older[].["48] In sum, FDA has concluded the scientific evidence supports limiting added sugar to just 5% of calories, or 2.5 grams, in individual foods marketed as healthy due to their nutrient content.

### 2. The Dietary Guidelines for Americans Recommend Limiting Consumption of Sugar-Sweetened Beverages

68.     The most recent 2020-2025 Dietary Guidelines for Americans state that for individuals 2 to 18 years old, sugar-sweetened beverages "are not necessary in the child or adolescent diet nor are they a component of the USDA Dietary Patterns. . . . Decreasing consumption of sugar-sweetened beverages to reduce added sugars intake will help youth achieve a healthy dietary pattern. Beverages that contain no added sugars should be the primary choice for children and adolescents."[49]

69.     The 2020-2025 Dietary Guidelines for Americans further state that "[m]ost adults' diets include choices across multiple food groups that are not in nutrient-dense forms and therefore cannot accommodate excess calories from sweetened beverages. Intake of sugar-sweetened beverages should be limited to small amounts and most often replaced with beverage options that contain no added sugars, such as water."[50]

### 3. Numerous Other Authoritative Bodies Recommend Significantly Limiting Added Sugar and Sugar-Sweetened Beverage Consumption

70.     The World Health Organization (WHO) recommends that no more than 10% of an adult's calories, and ideally less than 5%, come from free or added sugar.[51] Additionally, WHO expressly advises "limiting the consumption of . . . sugar-sweetened beverages (i.e. all types of beverages containing free sugars – these include carbonated or non-carbonated soft drinks, fruit or vegetable juices and drinks, liquid and

---

[48] *Id.*

[49] U.S. Dep't of Health & Human Servs. and U.S. Dept. of Agric., "Dietary Guidelines for Americans 2020 –2025," at 87 (8th ed.), *available at* https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf.

[50] *Id.* at 102.

[51] World Health Organization, "Healthy Diet," *available at* https://www.who.int/news-room/fact-sheets/detail/healthy-diet.

powder concentrates, flavoured water, energy and sports drinks, ready-to-drink tea, ready-to-drink coffee and flavoured milk drinks)[.]"[52]

71.     The American Heart Association recommends restricting added sugar to 5% of calories.[53] Based on the average caloric needs, this equates to 12 grams daily for children 4 to 8 years old, up to 25 grams for children up to 18 years old, 25 grams for women, and 38 grams for men. A single Ensure Nutrition Drink (22g added sugar) thus contains almost twice the daily sugar limit for children 4 to 8 years old, 88% of the daily limit older children and women, and 57% of the daily limit for men.

72.     The Heart and Stroke Foundation, in explaining "healthy eating basics," recommends "avoid[ing] sugary drinks."[54]

73.     The Centers for Disease Control and Prevention warns that "[t]oo much sugar in your diet can lead to health problems such as weight gain and obesity, type 2 diabetes, and heart disease" and that "[s]ugary drinks are the leading source of added sugars in the American diet."[55]

74.     The Harvard School of Public Health points out that "the Healthy Eating Pyramid says sugary drinks and sweets should be used sparingly, if at all, and the Healthy Eating Plate does not include foods with added sugars."[56]

## III.     ABBOTT'S REPRESENTATIONS AND OMMISIONS ARE FALSE AND MISLEADING

75.     For years, Abbott has marketed the Ensure Nutrition Drinks with labeling representations intended to appeal to consumers interested in health and wellness and intended to convince those consumers

---

[52] *Id.*

[53] Johnson, R.K., et al., on behalf of the American Heart Association Nutrition Committee of the Council on Nutrition, Physical Activity, and Metabolism and Council on Epidemiology and Prevention, "Dietary Sugars Intake and Cardiovascular Health: A Scientific Statement From the American Heart Association," *Circulation*, Vol. 120, 1011-20, at 1016-17 (2009).

[54] Heart and Stroke Foundation, Healthy eating basics, https://www.heartandstroke.ca/healthy-living/healthy-eating/healthy-eating-basics.

[55] Centers for Disease Control and Prevention, Know Your Limit for Added Sugars, https://www.cdc.gov/healthyweight/healthy_eating/sugar.html.

[56] Harvard T.H. Chan School of Public Health, "Added Sugar," The Nutrition Source (2022), *available at* https://www.hsph.harvard.edu/nutritionsource/carbohydrates/added-sugar-in-the-diet/.

that the Products are both generally healthy, meaning that they are the type of beverages that benefit health rather than detriment it, and that they provide specific types of health benefits or bodily support.

76.     As the scientific evidence demonstrates, Abbott's representations regarding the general healthfulness of the Products, as well as their representations that they are beneficial to immune, digestive, and heart health, are false, or at least highly misleading.

77.     First, with authoritative governmental and medical bodies like the FDA, WHO, and Dietary Guidelines for Americans recommending limiting added sugar consumption to less than 5% or 10% of daily calories for a healthy diet, and less than 5% of calories for a healthy food, it is misleading for Abbott to claim that its Ensure Nutrition Drinks provide "complete" and "balanced" nutrition when between 16.4% to 40% of their calories come from added sugar.

78.     Likewise, by calling the Products "nutrition" drinks, labeling them with additional health and wellness messages as identified herein, and touting them as "Doctor Recommended," Abbott conveys that the Products are healthy, meaning at least that they will not detriment health. But scientific evidence convincingly shows that consuming sugar-sweetened beverages like the Products causes serious, negative health consequences. Moreover, Abbott's health and wellness claims are deceptive, even if some nutrients in the Ensure Nutrition Drinks are capable of providing some potential health benefit, because regular consumption of the Products is likely to have an overall, net detrimental impact on health for most consumers.

79.     In addition, because sugar-sweetened beverage consumption is associated with increased risk of cardiovascular disease and mortality, Abbott's representations that its Ensure Complete Nutrition Shakes provide "Complete, Balanced Nutrition—For— . . . Heart" health, and its Ensure Enlive Advanced Nutrition Shakes provide "Heart" support are false, or at least highly misleading. Similarly, because sugar-sweetened beverage consumption harms gut microbiota and the gut barrier, Abbott's representations that its Ensure Complete Nutrition Shakes are beneficial for "Digestion" and its Ensure Enlive Advanced Nutrition Shakes are "All In One Digestion" support are false, or at least highly misleading. Likewise, because scientific evidence shows that the consumption of added sugars can, Abbott's representations that its Ensure Complete Nutrition Shakes and Ensure Advanced Nutrition Shakes provide "Immunity" or "Immune" support, are false, or at least highly misleading.

21

80.     Each of Abbott's health and wellness representations have the capacity, tendency, and likelihood to confuse or confound Plaintiff and other average consumers acting reasonably. The average consumer is not intimately familiar with the scientific evidence regarding the health effects of consuming added sugar. The average and reasonable consumer therefore is unaware of the extent to which consuming high amounts of added sugar, like that in the Ensure Nutrition Drinks, detrimentally effects overall health, or how it harms immune, digestive, and heart health. The average consumer is unaware of what amount of free sugar might have such an effect.

81.     Because the average consumer is not familiar with the science, he or she would believe that the Products provide the represented benefits notwithstanding their added sugar content, since the average consumer does not know the extent to which consuming the sugar in the Products adversely affects overall health, or how it harms immune, digestive, and heart health.

82.     And there is no way for a consumer to know—by simply looking at the label and without reviewing the scientific evidence—whether or not the Products in fact provide the claimed benefits.

83.     Numerous studies demonstrate that the mandatory Nutrition Facts Box is not sufficient to allow consumers to make accurate assessments of the healthfulness of foods and beverages.

84.     To start, "[m]any consumers have difficulty interpreting nutrition labels[.]"[57] In fact, the "mandated nutrition labels have been criticized for being too complex for many consumers to understand and use."[58] "Understanding the NFP label requires health literacy, that is, 'the capacity to obtain, process, and understand basic health information and services needed to make appropriate health decisions.' However, a sizable proportion of the US population is deficient in health literacy."[59]

85.     For example, "[t]he 2003 National Assessment of Adult Literacy found that more than one-third of the US population had only basic or below-basic health literacy, meaning they would have difficulty viewing the nutrition labels of 2 different potato chip packages and determining the difference in the number

---

[57] Persoskie A, Hennessy E, Nelson WL, "US Consumers' Understanding of Nutrition Labels in 2013: The Importance of Health Literacy," *Prev. Chronic Dis*. 14;170066 (2017).

[58] *Id.*

[59] *Id.*

of calories."[60] And other "studies have found that even high school graduates and college students lack the basic health literacy skills to effectively apply nutrition label information."[61] In sum, most consumers' "ability to interpret nutrition label information [is] poor" and "[e]ven a college education did not ensure nutrition label understanding."[62] Thus, "[a] substantial proportion of consumers in this country, including those with a college education, have difficulty understanding NFP labels, which is likely a function of limited health literacy."[63]

86.     In part as a result of low health literacy, it is reasonable for consumers to believe based on Abbott's advertising that the Products provide the claimed benefits, even in light of their added sugar content.

87.     Moreover, aside from the difficulty many consumers have using the nutrition facts panel, deciding if a food or beverage is healthy or unhealthy is a complex process, and the most consumers have difficulty accurately assessing the healthfulness of foods and beverages. One study testing consumers' ability to determine which of six snack products was the healthiest found that "[o]nly 9% of Americans could identify the healthiest cereal bar," and "81% wrongly identified the healthiest choice."[64] This demonstrates that identifying real, healthy products appears to be a serious difficulty for many American shoppers.[65]

88.     This problem is exacerbated when unhealthy products bear health and wellness representations, as with the Ensure Products. For example, "[b]everages that were perceived as having added nutrients were seen as healthier. Nutritional value appeared to be particularly relevant to participants' ranking of the relative healthfulness of beverages."[66] Likewise, if a beverage purported to provide a functional

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] Linda Verrill et al., "Vitamin-Fortified Snack Food May Lead Consumers to Make Poor Dietary Decisions," J. *Academy Nutr. and Dietetics*," Vol. 117:3, 376-385 (2017).

[65] *See id.*

[66] Aimee L. Brownbill et al., "What makes a beverage healthy? A qualitative study of young adults' conceptualisation of sugar-containing beverage healthfulness," *Appetite* Vol. 150, 104675 (2020).

benefit, "that functionality of beverages may negate concern about sugar content."[67] Other "research that has found that health-related and nutrient content claims make food and beverages seem healthier and more appealing."[68]

89.    Health positioning claims also have the specific effect of "decreas[ing] perceptions of the presence of certain less healthful nutrients." The presence of such claims makes consumers "1) less likely to look for nutrition information on the Nutrition Facts label, 2) more likely to select the product for purchase, 3) more likely to perceive the product as healthier, and 4) less likely to correctly choose the healthier product." [69] Thus, "health-related marketing . . . may mislead consumers to more positively assess the healthfulness of sugar-containing beverages."[70]

90.    Abbott does just this with its Ensure Nutrition Drinks. "By focusing on vitamin and mineral additives," it "distract[s] consumers from the health risks associated with some of the other common ingredients in [its] beverages," namely "sugar . . . delivered at levels that may have serious negative consequences."[71]

91.    Not surprisingly, some health and nutrition professionals have noted the misleading nature of Abbott's advertising of the Ensure Nutrition Drinks. For example, one article about Ensure says "[i]t is alarming that so many products on the market are labeled as 'healthy' and 'nutritious' when their ingredients really do not back up those claims."[72] It further explained that "[i]n 1995 the Center for Science in the Public Interest stated that advertisements for Ensure were 'the most misleading food ad' of the year."[73]

---

[67] *Id.*

[68] *Id.* (citations omitted).

[69] Linda Verrill et al., "Vitamin-Fortified Snack Food May Lead Consumers to Make Poor Dietary Decisions," *J. Academy Nutr. and Dietetics*, Vol. 117:3, 376-385 (2017).

[70] Aimee L. Brownbill et al., "What makes a beverage healthy? A qualitative study of young adults' conceptualisation of sugar-containing beverage healthfulness," *Appetite*, Vol. 150, 104675 (2020).

[71] *See* Crawford, Patricia, DrPH, RD, et al., "Hiding Under a Health Halo: Examining the Data Behind Health Claims on Sugary Beverages," California Center for Public Health Advocacy (Aug. 2014) [hereinafter "Crawford, Hiding Under a Health Halo"].

[72] Natural Terrain, *Are We Sure About Ensure?*, https://naturalterrain.com/are-we-sure-about-ensure/.

[73] *Id.*

92.     Another article explains that although "this Ensure 'healthy drink'" "sounds really promising[]" for those trying to "stay healthy and free of disease," that is not the case because "WHO recommends no more than 10% of energy in the diet to come from sugar, ideally below 5%," yet "[t]he sugar in this drink makes up a full **25 %** of the energy. Five times more than the maximum recommendation."[74] "This is not that different from eating a bag of candy or drinking soda. Add a vitamin pill and you'll get something very similar."[75]

93.     Additionally, in response to a 15-second advertisement for the Ensure Nutrition Drinks, Harvard Health Publishing issued a "Harvard Health Ad Watch" titled, "Are nutritional drinks actually good for you?"[76] It says, "[t]he suggestion [in the ad] is clear: to be healthy, you need to be drinking these supplements. A healthy diet won't suffice." Additionally, the "[p]roduct names deliver their own message. You can . . . "'ensure' you're getting all the nutrition you need by consuming these drinks." However, "[w]hat the ads don't say" is that the "vast majority of people can get all the nutrition they need from their diet. There's absolutely no evidence that these supplements improve health or prevent disease in people who have no specific nutritional problems . . . ." Harvard Health also pointed out that the "ads are missing important information" regarding "sugar," noting that "original Ensure has 14 grams added sugar."

94.     Rather than correct the misconception created by its marketing of the Ensure Nutrition Drinks, Abbott continues to leverage consumer confusion to increase its profits at the expense of consumers' health. Abbott even goes so far as to recommend daily consumption of the Ensure Nutrition Drinks, sometimes encouraging multiple drinks per day, and sometimes as a supplement, *i.e.* in addition to a consumer's regular diet. In fact, the Ensure Nutrition Drinks are most often located in the supplement aisle.

95.     It is unfair and deceptive for Abbott to "Recommend 2 bottles per day as part of a healthy diet" when following this recommendation would cause consumers to exceed the daily added sugar intake levels recommended by authoritative health bodies to prevent harm to health. For example, whereas the AHA

---

[74] Andreas Eenfeldt, MD, Ensure – the 'healthy' drink that contains mostly sugar and refined carbs, https://www.dietdoctor.com/want-ensure-get-sick-drink (Aug. 15, 2016).

[75] *Id.*

[76] Robert H. Schmerling, MD, *Harvard Health Ad Watch: Are nutritional drinks actually good for you?*, Harvard Health Publishing, Harvard Medical School (Sept. 18, 2020), *available at* https://tinyurl.com/45b6p3ar.

recommends that women and children avoid consuming more than 25 grams of sugar per day and that men avoid consuming more than 38 grams, following this recommendation from Abbott would result in a consumer drinking 44 grams of added sugar from Ensure alone.

96.     While representing that the Products are beneficial to overall health, and immune, digestive, and heart health, Abbott regularly and intentionally omits material information regarding the countervailing detrimental effects of the added sugars on overall health, and immune, digestive, and heart health.

97.     Abbott is under a duty to disclose this information to consumers because it is revealing some information about the Products—enough to suggest they are beneficial—without revealing directly relevant information regarding the harmful effects of added sugar described herein.

98.     Abbott is further under a duty to disclose this information because its deceptive omissions concern human health and safety, specifically the detrimental health consequences of consuming the Products.

99.     Abbott is further under a duty to disclose this information because it was in a superior position to know of the dangers presented by the added sugars in the Products, as it is a large sophisticated company that holds itself out as have expert knowledge regarding the impact of consuming the Products.

100.    Moreover, Abbott is under a duty to disclose this information because it actively concealed material facts not known to Plaintiff and the Class concerning the detrimental effects of regularly consuming the Products.

## IV.   THE ENSURE NUTRITION DRINKS' LABELING VIOLATES CALIFORNIA, NEW YORK, AND FEDERAL LAW

101.    "California, [and] New York . . . broadly prohibit the misbranding of food in language largely identical to that found in the FDCA." *Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *4 (E.D.N.Y. July 21, 2010). California Health and Safety Code §§109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See, e.g., id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto."). Similarly, "New York's Agriculture and Marketing law similarly . . . incorporates the FDCA's labeling

provisions found in 21 C.F.R. part 101." *Ackerman*, 2010 WL 2925955, at *4 (citing N.Y. Comp. Codes R. & Regs. tit. 1, § 259.1).

102.   The Ensure Nutrition Drinks and their challenged labeling statements violate the FDCA and its California and New York state law equivalents.

103.   First, the challenged claims are false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular." Abbott accordingly also violated California's and New York's parallel provision of the Sherman Law. *See* Cal. Health & Safety Code § 110670; N.Y. Agric. Mkts. Law § 201.

104.   Second, despite making the challenged claim, Abbott "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Ensure Nutrition Drinks at typical levels.

105.   Third, Abbott failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely, Abbott failed to disclose the increased risk of serious chronic disease and death that is likely to result from the usual consumption of the Ensure Nutrition Drinks in the customary and prescribed manners, including regular consumption of the standard serving size, or two drinks per day, where Abbott makes that recommendation.

## V.   PLAINTIFF'S PURCHASE, RELIANCE, AND INJURY

106.   Plaintiff Condalisa LeGrand has purchased Ensure Original Nutrition Shakes at different times during the Class Period. As best she can recall, Ms. LeGrand typically purchased the products from stores such as Walgreens located at 1150 Macdonald Ave, Richmond, CA 94801 and the Walmart located at 1400 Hilltop Mall Rd., Richmond, CA 94806.

107.   When purchasing Ensure Original Nutrition Shakes, Ms. LeGrand was seeking a healthy beverage. In purchasing the product, she was exposed to, read, and relied on Abbott's representations, including "nutrition shake," "Complete, Balanced Nutrition," "Complete, Balanced Nutrition for everyday health," and "Doctor Recommended." Based on these label claims, and the context of the labels as a whole, Ms. LeGrand reasonably believed that consuming Ensure Original Nutrition Shakes would provide her with

complete, balanced nutrition and would be beneficial rather than detrimental to her health when consumed regularly. For the reasons previously described, however, these claims, were and are deceptive.

108.    Plaintiff Larissa Bates has purchased Ensure Complete Nutrition Shakes during the Class Period. As best she can recall, Ms. Bates typically purchased the products from local stores such as Hannaford located at 900 Central Ave., Albany, NY 12206 and Price Chopper located at 911 Central Ave, Albany, NY 12206.

109.    When purchasing Ensure Complete Nutrition Shakes, Ms. Bates was seeking a healthy beverage. In purchasing the Ensure Complete Nutrition Shakes, Ms. Bates was exposed to, read, and relied on Abbott's representations, including that she was purchasing a "Complete" "nutrition shake" that was a "Complete, Balanced Meal Replacement," "Doctor Recommended," and supportive of "Immune," "Heart," and "Digestive" health. Based on these label claims, and the context of the labels as a whole, Ms. Bates reasonable believed that consuming Ensure Complete Nutrition Shakes would provide her with complete, balanced nutrition and would be beneficial rather than detrimental to her health when consumed regularly. For the reasons previously described, however, these claims, were and are deceptive.

110.    Plaintiffs are not nutritionists, food experts, or food scientists, but rather lay consumers who did not have the specialized knowledge that Abbott had about the scientific literature regarding the likely health effects of consuming the Ensure Nutrition Drinks given their added sugar content. At the time of their purchases, Plaintiffs were unaware of the extent to which consuming high amounts of added sugar adversely affects health or what amount of added sugar might have such an effect, especially in light of the Products' other nutrients.

111.    Plaintiffs acted reasonably in relying on the challenged labeling claims, which Abbott intentionally placed on the Ensure Nutrition Drinks' labeling with the intent to induce average consumers into purchasing the products.

112.    Plaintiffs would not have purchased the Ensure Nutrition Drinks if they knew that the challenged labeling claims were false and misleading in that the Ensure Nutrition Drinks are not complete, balanced nutrition, do not provide the specific health benefits promised, and are detrimental rather than beneficial to health.

113.   The Ensure Nutrition Drinks cost more than similar products without misleading labeling and would have cost less absent Abbott's false and misleading statements and omissions.

114.   Through the misleading labeling claims and omissions, Abbott was able to gain a greater share of the nutrition drink market than it would have otherwise and to increase the size of the market.

115.   Instead of receiving products that had actual healthful qualities, regularly consumption of the Ensure Nutrition Drinks that Plaintiffs and the Class received is likely to lead to increased risk of disease when consumed regularly.

116.   Plaintiffs paid more for the Ensure Nutrition Drinks, and would only have been willing to pay less, or unwilling to purchase them at all, absent the false and misleading labeling complained of herein.

117.   Plaintiffs would not have purchased the Ensure Nutrition Drinks if they had known that the products were misbranded pursuant to California and New York laws, and FDA regulations, or that the challenged claims were false or misleading.

118.   For these reasons, the Ensure Nutrition Drinks were worth less than what Plaintiffs and the Class paid for them.

119.   Plaintiffs and the Class lost money as a result of Abbott's deceptive claims, omissions, and practices in that they did not receive what they paid for when purchasing the Ensure Nutrition Drinks.

120.   Plaintiffs still wish to purchase healthy nutrition products with complete, balanced nutrition. They continue to see the Ensure Nutrition Drinks at stores where they shop. Plaintiffs would purchase Ensure Nutrition Drinks in the future if the products were as represented, but unless Abbott is enjoined in the manner Plaintiffs request, they will not be able to rely on Abbott's claims in the future.

121.   Plaintiffs would purchase the Ensure Nutrition Drinks if they could trust that the Products' representations were true, and not false or misleading, but absent an injunction, Plaintiffs will be unable to trust the representations or other similar health and wellness representations on the Ensure Nutrition Drinks when Plaintiff encounters them in the marketplace.

122.   Plaintiffs' substantive right to a marketplace free of fraud, where they are entitled to rely with confidence on representations such as those made by Abbott, continues to be violated every time Plaintiffs are exposed to the misleading labeling claims.

123.   Plaintiffs' legal remedies are inadequate to prevent these future injuries.

1

**CLASS ACTION ALLEGATIONS**

2

124.    While reserving the right to redefine or amend the class definition prior to or as part of a

3  motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent

4  a class of all persons in the United States, and subclasses of all persons in California and in New York, who,

5  at any time from four years preceding the date of the filing of this Complaint to the time a class is notified

6  (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the

7  Ensure Nutrition Drinks (the "Class").

8

125.    The members in the proposed Class, and each subclass, are so numerous that individual

9  joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single

10  action will provide substantial benefits to the parties and Court.

11

126.    Questions of law and fact common to Plaintiffs and the Class include:

12

a.    whether Abbott communicated a message through the packaging and

13  advertising of the Ensure Nutrition Drinks that they are nutritious, balanced, or healthful, or

14  that they support immune, digestive, and heart health;

15

b.    whether those messages are material, or likely to be material, to a reasonable

16  consumer;

17

c.    whether the challenged claims are false, misleading, or reasonably likely to

18  deceive a reasonable consumer;

19

d.    whether Abbott's conduct violates public policy;

20

e.    whether Abbott's conduct violates state or federal food statutes or regulations;

21

f.    whether Abbott was unjustly enriched;

22

g.    the proper amount of damages, including punitive damages;

23

h.    the proper amount of restitution;

24

i.    the proper scope of injunctive relief; and

25

j.    the proper amount of attorneys' fees.

26

127.    These common questions of law and fact predominate over questions that affect only

27  individual Class Members.

28

128.    Plaintiffs' claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Abbott's conduct. Specifically, all Class Members, including Plaintiffs, were subjected to the same misleading and deceptive conduct when they purchased the Ensure Nutrition Drinks and suffered economic injury because the Products are misrepresented. Absent Abbott's business practice of deceptively and unlawfully labeling the Ensure Nutrition Drinks, Plaintiffs and Class Members would not have purchased them or would have paid less for them.

129.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

130.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

131.    Abbott has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

132.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**

### **Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***

### **(On Behalf of the California Subclass)**

133.    California Plaintiff LeGrand realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

134.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

135.    The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

**Fraudulent**

136.    A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

137.    As set forth herein, Abbott's health and wellness claims relating to the Ensure Nutrition Drinks are likely to deceive reasonable consumers and the public.

**Unlawful**

138.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

•    The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

•    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

•    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and

•    The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq*.

**Unfair**

139.    Abbott's conduct with respect to the labeling, advertising, and sale of the Ensure Nutrition Drinks was unfair because Abbott's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

140.    Abbott's conduct with respect to the labeling, advertising, and sale of the Ensure Nutrition Drinks was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

141.    Abbott's conduct with respect to the labeling, advertising, and sale of the Ensure Nutrition Drinks was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by Abbott through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Ensure Nutrition Drinks believing they were nutritious, balanced, or healthy when in fact they are of the type that is likely to detriment health.

142. Abbott profited from the sale of the falsely, deceptively, and unlawfully advertised Ensure Nutrition Drinks to unwary consumers.

143. Plaintiff LeGrand and California Class Members are likely to continue to be damaged by Abbott's deceptive trade practices, because Abbott continues to disseminate misleading information. Thus, injunctive relief enjoining Abbott's deceptive practices is proper.

144. Abbott's conduct caused and continues to cause substantial injury to Plaintiff LeGrand and other Class Members. Plaintiff LeGrand has suffered injury in fact as a result of Abbott's unlawful conduct.

145. In accordance with Bus. & Prof. Code § 17203, Plaintiff LeGrand seeks an order enjoining Abbott from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

146. Plaintiff LeGrand and the Class also seek an order for the restitution of all monies from the sale of the Ensure Nutrition Drinks, which were unjustly acquired through acts of unlawful competition.

147. Because Plaintiff LeGrand's claims under the "unfair" prong of the UCL sweep more broadly than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, her legal remedies are inadequate to fully compensate her for all of Abbott's challenged behavior.

148. Moreover, because the Court has broad discretion to award restitution under the UCL and could, when assessing restitution under the UCL, apply a standard different than that applied to assessing damages under the CLRA or commercial code, and restitution is not limited to returning to Plaintiff LeGrand and California Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the UCL, and are therefore inadequate.

149. Finally, because the procedures for obtaining relief under the UCL are more efficient than under the CLRA or commercial code, Plaintiff's legal remedies are inadequate.

## SECOND CAUSE OF ACTION

### Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*

### (On behalf of the California Subclass)

150. California Plaintiff LeGrand realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

33

151.    The False Advertising Law (FAL) provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which [are] known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

152.    As alleged herein, the advertisements, labeling, policies, acts, and practices of Abbott relating to the Ensure Nutrition Drinks were likely to mislead consumers acting reasonably, as to their healthfulness and their benefits given their nutritional profiles.

153.    Plaintiff LeGrand suffered injury in fact as a result of Abbott's actions as set forth herein because she purchased the Ensure Nutrition Drinks in reliance on Abbott's false and misleading marketing claims stating or suggesting that the Ensure Nutrition Drinks are nutritious, balanced, and healthful.

154.    Abbott's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Abbott has advertised the Ensure Nutrition Drinks in a manner that is untrue and misleading, which Abbott knew or reasonably should have known, and omitted material information from the Ensure Nutrition Drinks' labeling.

155.    Abbott profited from the sale of the falsely and deceptively advertised the Ensure Nutrition Drinks to unwary consumers.

156.    As a result, Plaintiff LeGrand, the California Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Abbott was unjustly enriched.

157.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff LeGrand, on behalf of herself and the California Class, seeks an order enjoining Abbott from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

158.    Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code, and restitution is not limited to returning to Plaintiff LeGrand and California

Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

159.     In addition, because the procedures for obtaining relief under the FAL are more efficient than under the CLRA or commercial code, Plaintiff's legal remedies are inadequate.

## THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*

### (On behalf of the California Subclass)

160.     California Plaintiff LeGrand realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

161.     The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

162.     Abbott's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Ensure Nutrition Drinks for personal, family, or household purposes by Plaintiff LeGrand and California Class Members, and violated and continue to violate the following sections of the CLRA:

a.      § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.      § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.      § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.      § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

163.     Abbott profited from the sale of the falsely, deceptively, and unlawfully advertised Ensure Nutrition Drinks to unwary consumers.

164.     Abbott's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

165.    Pursuant to California Civil Code § 1782, more than 30 days before filing this lawsuit, Plaintiff LeGrand sent written notice of their claims and Abbott's particular violations of the Act to Abbott by certified mail, return receipt requested, but Abbott has failed to implement remedial measures.

166.    Plaintiff LeGrand and the Class have suffered harm and seek (a) actual damages resulting from purchases of the Ensure Nutrition Drinks sold throughout the Class Period to all Class Members, (b) punitive damages, (c) injunctive relief in the form of modified advertising and a corrective advertising plan, (d) restitution, and (e) attorneys' fees and costs. *See* Cal. Civ. Code § 1782(d).

167.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

### FOURTH CAUSE OF ACTION

### Breaches of Express Warranties, Cal. Com. Code § 2313(1)

### (On behalf of the California Subclass)

168.    California Plaintiff LeGrand realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

169.    Through the Ensure Nutrition Drinks' labeling, Abbott made affirmations of fact or promises, or description of goods, that, *inter alia*, the products offer complete, balanced nutrition, are beneficial to health, and provide specific health benefits.

170.    These affirmations and descriptions include:

- "Complete, Balanced Nutrition";

- "Complete, Balanced Nutrition - For Everyday Health";

- "Complete, Balanced Meal Replacement";

- "Immune . . . Heart . . . Digestion"

- "All In One Immune . . . Heart . . . Digestion" support;

- "Complete is Ensure's most advanced Complete, Balanced Nutrition shake . . . .";

- "with Nutrients for Immune System Support."

- "most advanced nutritional product, designed to help rebuild your strength and energy from the inside, with an All-in-One blend to support your health";

- "Complete, Balanced Nutrition—For— . . . Immune [and] Heart" health;

- "Complete is Ensure's most advanced Complete, Balanced Nutrition shake . . . ";

- "therapeutic nutrition shake";

- "nutrition shake";

- "nutrition drink"; and

- "nutrition powder".

171.    These representations were "part of the basis of the bargain," in that Plaintiff LeGrand and the Class purchased the Ensure Nutrition Drinks in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

172.    Abbott breached its express warranties by selling Ensure Nutrition Drinks that do not meet the above affirmations, promises, and product descriptions because scientific evidence demonstrates that a balanced, nutritious diet excludes sugar-sweetened beverages, and otherwise limits added sugar to less than 5% of calories, whereas regular consumption of the Ensure Nutrition Drinks is detrimental, rather than beneficial to health.

173.    Abbott's breach actually and proximately caused injury in the form of the lost purchase price that Plaintiff LeGrand and California Class Members paid for the Ensure Nutrition Drinks.

174.    As a result, Plaintiff LeGrand seeks, on behalf of herself and other Class Members, actual damages resulting from Abbott's breaches of express warranty, including, without limitation, expectation damages.

**FIFTH CAUSE OF ACTION**

**Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314**

**(On behalf of the California Subclass)**

175.    California Plaintiff LeGrand realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

176.    Abbott, through its acts set forth herein, in the sale, marketing, and promotion of the Ensure Nutrition Drinks bearing statements outlined in paragraph 170, made representations, that, *inter alia*, the products offer complete, balanced nutrition, are beneficial to health, and provide specific health benefits, such as "Immune," "Heart," and "Digesti[ve]" health.

177.     Abbott is a merchant with respect to the goods of this kind which were sold to Plaintiff LeGrand and the Class, and there were, in the sale to Plaintiff LeGrand and the Class, implied warranties that those goods were merchantable.

178.     However, Abbott breached that implied warranty because a balanced, nutritious diet excludes sugar-sweetened beverages, and otherwise limits added sugar to less than 5% of calories, whereas regular consumption of the Ensure Nutrition Drinks is detrimental, rather than beneficial to health.

179.     As an actual and proximate result of Abbott's conduct, Plaintiff LeGrand and the Class did not receive goods as impliedly warranted by Abbott to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

180.     As a result, Plaintiff LeGrand seek actual damages, including, without limitation, expectation damages.

### SIXTH CAUSE OF ACTION

### Unfair and Deceptive Business Practices, N.Y. Gen. Bus. L. § 349

### (On behalf of the New York Subclass)

181.     Plaintiff Bates realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

182.     Abbott's conduct constitutes deceptive acts or practices or false advertising in the conduct of business, trade, or commerce or in the furnishing of services in New York which affects the public interest under N.Y. Gen. Bus. L. § 349.

183.     As alleged herein, Abbott engaged in, and continues to engage in, deceptive acts and practices by advertising, marketing, distributing, and selling the Ensure Nutrition Drinks with false or misleading claims and representations, and deceptive omissions.

184.     As alleged herein, by misbranding the Ensure Nutrition Drinks, Abbott engaged in, and continues to engage in, unlawful and deceptive acts and practices.

185.     Abbott's conduct was materially misleading to Plaintiff Bates and the New York Class. During the Class Period, Abbott carried out a plan, scheme and course of conduct which was consumer oriented.

186.    As a direct and proximate result of Abbott's violation of N.Y. Gen. Bus. L. § 349, Plaintiff Bates and the New York Class were injured and suffered damages.

187.    The injuries to Plaintiff Bates and the New York Class were foreseeable to Abbott and, thus Abbott's actions were unconscionable and unreasonable.

188.    Abbott is liable for damages sustained by Plaintiff Bates and the New York Class to the maximum extent allowable under N.Y. Gen. Bus. L. § 349, actual damages or $50 per unit, whichever is greater.

189.    Pursuant to N.Y. Gen. Bus. L. § 349(h), Plaintiff Bates and the New York Class seek an Order enjoining Abbott from continuing to engage in unlawful acts or practices, false advertising, and any other acts prohibited by law, including those set forth in this Complaint.

## SEVENTH CAUSE OF ACTION

### False Advertising, N.Y. Gen. Bus. L. § 350

### (On behalf of the New York Subclass)

190.    Plaintiff Bates realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

191.    Abbott has engaged and is engaging in consumer-oriented conduct which is deceptive or misleading in a material way (both by affirmative misrepresentations and by material omissions), constituting false advertising in the conduct of any business, trade, or commerce, in violation of N.Y. Gen. Bus. L. § 350.

192.    As a result of Abbott's false advertising, Plaintiff Bates and the New York Class Members have suffered and continue to suffer substantial injury, including damages, which would not have occurred but for the false and deceptive advertising, and which will continue to occur unless Abbott is permanently enjoined by this Court.

193.    Plaintiff Bates and the New York Class seek to enjoin the unlawful acts and practices described herein, and to recover their actual damages or $500 per unit, whichever is greater, and reasonable attorney fees.

**EIGHTH CAUSE OF ACTION**

**Unjust Enrichment**

194.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

195.    Plaintiffs and Class Members conferred upon Abbott an economic benefit, in the form of profits resulting from the purchase and sale of the Ensure Nutrition Drinks.

196.    Abbott's financial benefits resulting from their unlawful and inequitable conduct are economically traceable to Plaintiffs' and Class Members' purchases of the Ensure Nutrition Drinks and the economic benefits conferred on Abbott are a direct and proximate result of its unlawful and inequitable conduct.

197.    It would be inequitable, unconscionable, and unjust for Abbott to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

198.    As a result, Plaintiffs and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Abbott as a result of such business practices.

**NINTH CAUSE OF ACTION**

**Negligent Misrepresentation**

199.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

200.    Abbott marketed the Ensure Nutrition Drinks in a manner conveying to reasonable consumers that the Products promote general health and wellness, and provide specific health benefits, like immune, heart, and digestive health support.

201.    Abbott's misrepresentations regarding the Ensure Nutrition Drinks are material to a reasonable consumer because they relate to human health, both generally and specifically to immune, heart, and digestive health. Reasonable consumers would attach importance to such representations and would be induced to act thereon in making purchase decisions.

202.    In selling the Ensure Nutrition Drinks, Abbott acted in the ordinary course of its business and had a pecuniary interest in Plaintiffs and Class Members purchasing the Ensure Nutrition Drinks.

203.    Abbott owed a duty of care to Plaintiffs, not to provide them false information when they were making their purchase decisions regarding the Ensure Nutrition Drinks.

204.    Abbott knew or had been negligent in not knowing that the Ensure Nutrition Drinks did not promote health, but instead, consuming sugar sweetened beverages, like the Ensure Nutrition Drinks, harms rather than supports overall health of the average consumer and harms rather than supports immune, heart, and digestive health in particular. Abbott had no reasonable grounds for believing its misrepresentations were not false and misleading.

205.    Abbott intends that Plaintiffs and other consumers rely on these representations, as evidenced by the intentional and conspicuous placement of the misleading representations on the Ensure Nutrition Drinks packaging by Abbott.

206.    Plaintiffs and Class Members have reasonably and justifiably relied on Abbott's misrepresentations when purchasing the Ensure Nutrition Drinks, and had the correct facts been known, would not have purchased them at the prices at which they were offered.

207.    Therefore, as a direct and proximate result of Abbott's negligent misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, in the amount of the Ensure Nutrition Drinks' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**

**Intentional Misrepresentation**

208.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

209.    Abbott marketed the Ensure Nutrition Drinks in a manner conveying to reasonable consumers that the Products promote general health and wellness, as well as providing specific health benefits, like supporting immune, heart, and digestive health. However, consuming sugar sweetened beverages like the Ensure Nutrition Drinks harms, rather than supports the overall health of the average consumer and harms rather than supports immune, heart, and digestive health. Therefore, Abbott has made misrepresentations

41

about the Ensure Nutrition Drinks.

210.    Abbott's misrepresentations regarding the Ensure Nutrition Drinks are material to a reasonable consumer because they relate to human health, both generally and specifically to immune, heart, and digestive health. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchase decisions.

211.    At all relevant, Abbott knew that the misrepresentations were misleading, or has acted recklessly in making the misrepresentations, without regard to their truth.

212.    Abbott intends that Plaintiffs and other consumers rely on these misrepresentations, as evidenced by the intentional and conspicuous placement of the misleading representations on the Ensure Nutrition Drinks' packaging by Abbott.

213.    Plaintiffs and members of the Class have reasonably and justifiably relied on Abbott's intentional misrepresentations when purchasing the Ensure Nutrition Drinks; had the correct facts been known, they would not have purchased the Products at the prices at which the Products were offered.

214.    Therefore, as a direct and proximate result of Abbott's intentional misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, in the amount of the Ensure Nutrition Drinks' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## PRAYER FOR RELIEF

215.    Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Abbott as to each and every cause of action, and the following remedies:

a.    An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

b.    An Order requiring Abbott to bear the cost of Class Notice;

c.    An Order compelling Abbott to conduct a corrective advertising campaign;

d.    An Order compelling Abbott to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending products;

e.  An Order requiring Abbott to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

f.  An Order requiring Abbott to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

g.  An Order requiring Abbott to pay compensatory damages and punitive damages as permitted by law;

h.  An award of attorneys' fees and costs; and

i.  Any other and further relief that Court deems necessary, just, or proper.

## **JURY DEMAND**

216.  Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: October 6, 2022        /s/ Melanie Persinger

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***